No. 80-177

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

IN RE THE MARRIAGE OF

JOANNE D. KARR,

Petitioner and Cross-Appellant,

vs.

JAMES H. KARR,

Respondent and Appellant.

Appeal From: District Court of the First Judicial District,
In and for the County of Lewis and Clark.
Honorable Gordon Bennett, Judge presiding.

Counsel of Record:

For Appellant:

Robert J. Emmons, Great Falls, Montana

For Respondent:

James L. Norris, Vermillion, So. Dakota

Submitted on briefs: December 23, 1980

Decided: April 1, 1981

Filed: APR 1 1981

_____ Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

James H. Karr appeals from a judgment entered in the First Judicial District Court, Lewis and Clark County, in favor of Joanne D. Karr in a marriage dissolution case where the District Court awarded the wife $190,926 as a lump sum settlement of the marital estate, and an additional $15,081.69 for attorney fees.

Judgment was entered on February 28, 1980. Notice of entry of judgment was served on the same day and James made timely motions objecting to the personal jurisdiction of the court over him. He also moved to amend the findings of fact, conclusions of law, and judgment entered by the court. Timely appeal was filed by James after his motions were deemed denied.

Joanne cross-appealed with respect to her right upon dissolution for an equitable portion of the husband's military retirement.

The facts in this case are long and especially complicated. For purpose of clarity, we take, essentially, the facts found by the District Court in its findings.

The first finding of the District Court is significant because it gives a clearer understanding of the reasons for the eventual judgment entered by the District Court. The court found that James was

> ". . . a highly unreliable, untrustworthy, evasive, intentionally confusing, studiously misleading and, on occasion, patently perjurious witness. His testimony, given upon discovery or at trial, on material facts, was therefore approached with the greatest caution, accepted in full only where clearly substantiated by other evidence and weighed lightly in the face of conflicting evidence. The Court's distrust of this witness extends to profferred documents. As will be noted in the Conclusions of Law set forth herein, the fifty-one requests for admissions submitted by

-2-

[James] after the close of discovery and immediately before trial by way of a pre-trial memorandum are not deemed by the Court to be admitted for failure of the petitioner to deny them and are not relied upon in the following Findings of Fact."

The Court further found:

"[Joanne and James] were married in Mobile, Alabama on July 12, 1946. At the time of the marriage they had no assets. [James] was attending flight school for the United States Navy in Pensacola, Florida. [Joanne] joined [him] and was employed immediately thereafter. [James] was transferred to Guam in 1947 and after a few months [Joanne] joined him and found employment and continued to live in Guam for the next thirteen months. [James] was transferred from Guam in 1948 and [Joanne] returned to the United States, residing with her mother. [James] was assigned to Moffitt Field, California in January, 1949 and the parties moved to Palo Alto, California. While [James] was stationed at Moffitt Field [Joanne] was not employed outside the home but did some entertaining as she was required to do as an officer's wife. [James] got out of the Navy in 1950 and enrolled at Stanford University in Palo Alto, California. [Joanne] was employed outside the home and remained employed until she had to leave the job when the parties moved to San Francisco upon [James] being accepted for dental school in September, 1952. [Joanne] and [James] each received approximately $2,000 from their respective father's estates, which they used to help purchase a residence in the Palo Alto area in approximately 1950. After [James] was accepted for dental school and the parties moved to San Francisco, [Joanne] managed an apartment house in exchange for free rent. [Joanne] was accepted for dental hygiene school in 1953 and the parties moved to an apartment two blocks from the school. [Joanne] was in the dental hygiene school for two years and graduated in 1955. Immediately upon graduation, [Joanne] accepted a position at the University of California as director of the dental hygiene program and was so employed from 1955 until 1959. While [James] was in dental school he was accepted in the United States Army as a senior dental student in 1955 and upon graduation in 1956 he was assigned in the San Francisco Bay area until 1959. The parties adopted a daughter KATHERYN ANN in 1957. In that year the parties purchased a residence located . . . [in] San Rafael, California. They sold the house in the Palo Alto area and used the proceeds for the down payment on the residence, which they purchased as joint tenants. They resided in the San Rafael home until August, 1960, when they were transferred to Turkey. They rented their property from 1960 to June, 1979; the mortgage payments

on the property were paid from the proceeds of rent and at the time of trial the property was unencumbered. Their second daughter, KARYN IRENE was born to them in May, 1958. During their residence in San Rafael [Joanne] took care of the housekeeping and the children and was not employed. The parties' son, JAMES KURTIS, was born in September of 1961 while the parties were stationed in Turkey. While petitioner was in Turkey she was the secretary of the officers' wives club where she assisted in writing the club by-laws and constitution. In addition she was assigned to assist newly transferred Army families. She was expected to entertain as an officer's wife which she did while in Turkey as well as while she was in the San Francisco Bay area. In the spring of 1963 [James] was transferred from Turkey to Fort Douglas in Salt Lake City, Utah. The parties were stationed at Fort Douglas from April, 1964 until August of 1965. While there, [Joanne] participated in the officers' wives club and cared for families that were transferring into the area from other installations. In addition, she was on the church altar committee, taught Sunday School and was responsible for organizing a pre-school nursery. She also cared for the house and the children while in Salt Lake. In August, 1965, [James was] transferred to San Antonio, Texas but remained there only until December, 1965, when he became ill and was hospitalized in November and transferred to Denver, Colorado, where the parties lived from January, 1966 to February, 1967. The parties purchased a home while stationed in Denver, and sold it in 1970. They rented it from February, 1967, until it was sold. From the proceeds of the sale of this home [James] bought a 1960 Cessna 182 airplane for $9,000. While stationed in Denver [Joanne] helped in hospital recreation. In February, 1967, the parties were transferred to Fort Campbell, Kentucky and were stationed there until the latter part of 1968 when [James] retired from the Army. Fort Campbell was located in an isolated area and as a result [Joanne] was very involved in officers' wives activities and assisted the enlisted men's wives in community projects. She continued as a Girl Scout leader and helped newly-arrived Army families in becoming adjusted to the area. In September, 1968, [Joanne] began work on her master's degree in dental hygiene at the University of Iowa. This schooling was paid for by a federal government grant. [James] joined [Joanne] in December of 1968 and the parties resided in Iowa until the summer of 1969. [James] was not employed and drew unemployment benefits. The parties were both employed as teachers at the University of Edmonton, Alberta, in the fall of 1969 and taught there for two years. [Joanne] was paid $12,000 a year and [James] $16,000 a year. [Joanne] cared for the house and children in addition to her teaching. In 1971 they moved to Bounty, Saskatchewan, where they lived in a small house with a wood stove and grew most of their own vegetables. Neither party worked while they lived there until 1972. In 1972 they went to California to open a dental practice. [James] opened a dental

practice in Chico, California, in February, 1973, but closed the office after six months. [Joanne] assisted [James] in the practice. They then moved to Oyen, Alberta, where [James] signed a lease with the Big County Medical-Dental Clinic. While [James] was to open his dental practice in Oyen in November of 1973, he left to go back to California in order to take flying lessons to get his pilot's license. [Joanne] worked in the dental office in Oyen, but since [James] failed to come back to Oyen until March of 1974 this led to a lawsuit, but the parties were successful and as a result stayed in Oyen for a period of two years. In August, 1975, [Joanne] came to Helena, Montana where she was employed by Carroll College teaching in the dental hygiene program and is so employed at time of trial. [James] lived variously in Canada, Montana and California until the filing of this action in May, 1977. He has been generally unemployed for the past four years."

The District Court concluded from the above facts, which were essentially uncontested, that during the 31 years of their marriage, the contributions of the parties to the family fortune are undistinguishable both as to amount and kind and should therefore be deemed equal.

After discussing the various assets owned by the parties and the activities with respect to those separate assets either as to acquisition or disposition, the court found the marital property should be valued as follows:

| | |
|---|---|
| "Real property located at 427 Fairhills Drive, San Rafael, California | $185,000.00 |
| "Real property located at Stettler, Alberta | 26,000.00 |
| "Real property located in Bounty, Saskatchewan | 550.00 |
| "Life insurance | |
| "Equitable Insurance Co., | 8,067.75 |
| "N.Y. Life Insurance Co., | 2,465.00 |
| "Fidelity Mutual Life Insurance Co., | |
| "Policy 965730 | 1,285.43 |
| "Policy 858127 | 2,251.95 |
| "Policy 859116 | 625.16 |
| "Policy 971188 | 140.66 |
| "Equity stock | |
| "Koppers Co. | 4,600.00 |
| "Diamond Shamrock | 3,450.00 |
| "White Motor | 360.00 |
| "Canadian dental retirement fund | 10,505.00 |
| "Balance of proceeds from Wells Fargo bank account | 10,089.00 |
| "Proceeds of deposit in Treasury Branch of The Province of Alberta | 12,000.00 |
| "Proceeds of deposit in Royal Bank of Conquest | 4,000.00 |
| "Canadian Bonds | 15,000.00 |
| "Total | $286,389.00" |

The court further found that the marital property should be equitably apportioned between the parties on the ratio of two-to-one in favor of Joanne. The court specifically referred to section 40-4-202, MCA, in making the apportionment and considered each of the factors set forth in that section, particularly that clause that says "the opportunity of each for future acquisition of capital assets and income." In connection with that factor, the District Court found:

> "F. [Joanne] has a single source of income from a job of uncertain duration with a salary of $16,000 a year, and in which there is little reasonable expectation of advancement. [James] has a pension that provides him with $13,260 a year without working and can engage, without diminution of the pension, in the profession of dentistry or in commercial aviation. While no evidence was introduced as to how much dentists or pilots make, there is no legal requirement that Courts be born yesterday. I think it is not subject to reasonable dispute that dentists generally make a great deal more than their hygienists or more than assistant professors at Carroll or more than $16,000 a year gross income. The same could reasonably be said of commercial pilots, but, concededly, with not so much certainty. I conclude from this that [James'] ability and actual opportunities to earn and acquire capital assets is at least double that of [Joanne's.]"

The principal bone of contention with respect to the findings of fact seems to be the conclusion of the court that it could consider, in making the marital assets disposition, the fact that James was entitled to an army retirement pension. In connection with that, the court found in Finding No. 19:

> "At the time of the dissolution, [James] was receiving $1,105 a month as Army retirement pay. He is 55 years old. It can be reasonably expected that in the normal course of events [James] will also have all rights in the Army's lifetime medical program and its commissary privileges. [Joanne] will not share in either the pension or the medical or commissary benefits. There is no medical reason why he cannot be employed as either a dentist or pilot, both of which he is qualified to do, even though he has been rated 60% disabled for purposes of Army retirement. No good cause was shown for his being unemployed since the inception of this litigation."

-6-

The District Court did not include the pension as a part of the military profit, nor use it as a set off. It stated:

"H. While [James'] pension cannot be included in the marital property, or used as a set-off, it can be considered as a source of income in arriving at an equitable apportionment required by the statute, just as it may be used in determining alimony or maintenance. Eschenburg v. Eschenburg [(1977),] 171 M. 247, [557 P.2d 1014]; Cromwell v. Cromwell [(1979), ___ Mont. ___, 588 P.2d 1010,] 36 St. Rep. 60. The federal law may hold our wrist from reaching into [James] retirement salary, but it need not blind our eyes to the reality of the situation. [James] has a comfortable secure retirement income, in being, for the rest of his life. [Joanne], although she contributed as much to it as he did, will never receive a cent of it. After [James] had begun enjoying his retirement income, [Joanne] was forced to begin a retirement program of her own, at the age of 50, with an organization from which she could be dismissed, without fault on her part, next year. She has, in a word, a very small retirement fund at present and virtually no retirement security."

The District Court then concluded that to maintain herself in her present way of life, Joanne required a monthly expenditure of $800. Using the evidence of a CPA, the court determined that this $800, at the time she reached age 62 would require, because of inflation, $1,400 a month to replace. Inasmuch as James had a pension of $13,260 a year, and the capacity to earn additional monies as a dentist or pilot, the court concluded it would award a lump sum settlement to Joanne sufficient to provide her with a like retirement source, in view of their 31 years of marriage.

Finally, the District Court concluded that because his prior record revealed in the proceedings in this cause, James would not obey court orders, would undoubtedly delay in any monthly payments, and the making of any order by the court was useless, unless the court could provide a way that his obeyance of the order was inescapably necessary. Accordingly, the District Court entered judgment against James to pay

-7-

Joanne $190,926, as and for her portion of marital estate. She was to deliver to the District Court, in escrow, all indicia of title to marital assets that would have to be transferred to James upon satisfaction of the judgment.

The District Court also awarded attorney fees of $15,081.69, upon its finding that her attorney had expended 306.5 hours of work at $42.21 per hour, which was found reasonable, and had incurred costs of $2,145.69. The court further found that 80 percent of the attorney fees incurred by Joanne could have been avoided if there had been a "modicum of cooperation" from James.

The issues raised by James on his appeal, restated, are these:

1.  Did the District Court err in considering in any way the military pension of James?

2.  Did the District Court err in awarding attorney fees of $15,081.69 to Joanne?

3.  Did the District Court have jurisdiction over James when he was served by summons in the marital dissolution cause?

4.  Did the District Court err by including or excluding certain assets of the estate?

With respect to the cross-appeal of Joanne, the issue she raises is:

1.  Did the District Court err in not determining the present value of the future pension benefits to be received by James and including them as a part of the marital estate for division between the parties?

Issue No. 1. Did the District Court err in considering in any way the military pension of James?

This issue is inevitably connected with James' further contention that the District Court, in considering the

-8-

capacity of the parties to acquire capital assets, should not have determined that James, if he chose to be employed, could earn additional income as a dentist or pilot.

The District Court was careful not to include the value of the retirement pension to be received by James as a part of the marital estate. Instead the District Court considered the retirement pension, and James' earning capacity as a dentist or a pilot, in determining the ability of the parties to acquire capital assets in the future. Since this is one of the factors required to be determined by a District Court in section 40-4-202, MCA, the court concluded that those factors required a two-to-one ratio in the division of the marital estate to put Joanne on the same footing as James in her capacity to acquire future capital assets.

In In Re Marriage of Miller (1980), ___ Mont. ___, 609 P.2d 1185, 37 St.Rep. 556, we approved the District Court's use of the present value of a husband's military retirement pension as a part of the marital estate. Miller relied (as does James in this case) on Hisquierdo v. Hisquierdo (1979), 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1. There, the District Court had held that the treatment of a railroad pension receivable under the Railroad Retirement Act, 45 U.S.C. § 231, et seq., as community property, violated the purpose of the act and was prohibited by the federal supremacy clause. We distinguished Hisquierdo from the Miller situation, particularly because the provisions of the Railroad Retirement Act explicitly terminated a spouse's benefits upon absolute divorce. We said we could not determine that the federal statutes relating to military retirement pensions directly or indirectly prevented the distribution of the value of the pension rights as a part of the marital estate.

-9-

In, In Re Marriage of McGill (1980), ___ Mont. ___, 609 P.2d 278, 37 St.Rep. 578, we expressed dissatisfaction where the District Court awarded the wife only 15 percent of the husband's military pension. There is no other clear holding in McGill that would be applicable with respect to the military pension in this case.

In Ebert v. Ebert (1980), ___ Mont. ___, 616 P.2d 379, 37 St.Rep. 1674, we noted a complicated situation in that the husband had not yet retired so as to be eligible for his military pension, although the wife claimed the military pension should be considered as a part of the marital estate. We reversed and remanded the cause in that case for a consideration by the District Court as to whether the military pension should be considered a part of the marital property.

It is a duty of the District Court, in apportioning the marital assets, to consider "the opportunity of each for the future acquisition of capital assets and income." Section 40-4-202, MCA. In Smith v. Smith (1981), ___ Mont. ___, 622 P.2d 1022, 38 St.Rep. 146, we remanded the cause because we found that the court had failed to consider the wife's inability to acquire property or income in the future.

Although in the foregoing cases cited, this Court has come down on the side of including federal military pensions as a part of the marital estate, such rulings are of no significant moment here. The District Court in this case was careful not to include the value of the military pension as a part of the marital estate. Instead, the District Court considered James' pension income, and his capacity to earn other income, in determining their respective opportunities for the future acquisition of capital assets and income. In that light, the reasoning of the court is not

far separated from that of this Court in Eschenburg v.
Eschenburg (1976), 171 Mont. 247, 252, 557 P.2d 1014, 1016,
wherein we said:

> "Defendant argues that his Army pension is
> not property jointly acquired during the
> marriage and as such is not subject to
> division whereby plaintiff received a portion.
> What defendant fails to comprehend is that
> the district court made no property division
> of the pension but directed defendant to pay
> $500 per month alimony from the pension or
> 'in lieu thereof from any earnings he may
> acquire in excess of said retirement.' Without
> acquired property subject to property division,
> the pension is a source of income to defendant
> which the district court properly considered in
> fixing his financial ability to pay alimony as
> related to the financial needs of plaintiff."
> (Emphasis added.)

The Eschenburg case was a decision relating to section
21-139, R.C.M. 1947, now repealed, but the logic of that
case is applicable though the statute here pertinent was
enacted later as a part of the new family law code. Section
21, Ch. 536, Laws of 1975. The command of section 40-4-202,
MCA, is that the District Court make an equitable apportion-
ment of the marital assets. We hold it proper, and in
harmony with the principles of equity, that the District
Court consider the income from a party's federal military
retirement pension, earned during the marriage, in arriving
at an equitable apportionment on the marital assets, parti-
cularly when the District Court is considering the statutory
factor of the parties' opportunity for future acquisition of
capital assets and income.

James contends further that 89 percent of his pension
is exempted from federal taxation, and as such, that portion
of his pension should not have been considered available
when the court apportioned the marital assets. On this
basis, James distinguishes our holding in Miller, because

-11-

his pension is a disability pension, whereas, Miller's was not. On this basis, James contends that the Hisquierdo case is applicable.

James was discharged from the Armed Services for retirement by reason of physical disability. 10 U.S.C. § 1403, relating to disability retirement pay, provides that part of the retirement pay of a member of the Armed Services, which exceeds the retirement pay that he would have received if it were not computed on the basis of percentage disability, is not considered as pension, annuity or similar allowance. Under 26 U.S.C., § 104(a)(3), the amount of any pension resulting from an allowance for personal injuries or sickness is exempt from federal income taxation. James contends that 89 percent of his retirement represents the excess of his pension received because of his disability, is not taxable, and should not be regarded as a pension. Therefore, he insists that it may not be considered by the court for any purpose in connection with the marital dissolution. His pension, or a part thereof, is now administered by the Veteran's Administration. Under 38 U.S.C. § 3101(a), payments made under any law administered by the Veterans' Administration are not subject to taxation, creditors claims, nor to any attachment or levy. These factors, James contends, brings the disability portion under Hisquierdo, supra, which involved a flat prohibition against attachment and anticipation.

In answer, Joanne maintains that the administration of James' military retirement pension, or a portion thereof, by the Veterans' Administration, was accomplished by him after the commencement of this litigation in 1979. Joanne further contends that this issue is answered by the case of In Re Marriage of Milhan (1980), 27 Cal.3d 765, 613 P.2d 812, 166 Cal.Rptr. 533.

-12-

In _Milhan_, the trial court had awarded the wife one-half of the husband's military retirement pay and one-half of the cash surrender of his military insurance policies. The husband contended that under _Hisquierdo_, the award of the pension fund and of property equivalent to her community property interests in the military insurance policies was error. The California Supreme Court rejected this _Hisquierdo_ argument, saying:

> "In _Fithian_ [10 Cal.3d 592, 517 P.2d 449, 111 Cal.Rptr. 369] this court found that 'California community law [does not] interfere [sic] in any way with the administration or goals of the federal military retirement pay system . . .' (_Fithian_, _supra_, 10 Cal.3d at p. 604, 111 Cal.Rptr. at p. 377, 517 P.2d at p. 457.) Accordingly, the court held that state law was not preempted. Nothing in _Hisquierdo_ conflicts with this conclusion. Military retirement pay was enacted, inter alia, to 'provide [servicemen] with an incentive to remain in the Armed Services . . .' (Id. at p. 599, 111 Cal.Rptr. at p. 373, 517 P.2d at p. 453.) The federal interest which required preemption in _Hisquierdo_--an incentive for pension holders to retire--does not exist in the military retirement system." (Emphasis added.)

_Milhan_ disposes of the same contention now raised by James in this case respecting the administration of his pension by the Veteran's Administration. It is stated in _Milhan_:

> "Mr. Milhan opted to receive a pension administered by the Veterans' Administration. This opinion [sic] is computed solely on the basis of his disability. (See 38 U.S.C. §§ 314, 334.) In order to receive this benefit, Mr. Milhan waived his right to an equivalent amount of retirement pay. (38 U.S.C. § 3105.) The reasoning of _Stenquist_ applies with equal force to this situation and to title 10 disability benefits. However classified for administrative purposes, disability benefits under _Stenguist_ [sic] are separate property in California only insofar as they exceed the amount of retirement pay waived. Significantly, Mr. Milhan does not appear to contest this proposition. Instead, he contends that under _Hisquierdo_ the rule in _Stenquist_ violates the supremacy clause of the United States Constitution.

"This contention lacks merit. Insofar as disability benefits replace retirement pay waived as a condition of receipt, they perform the same functions as retirement pay. (Stenquist, supra, 21 Cal.3d at p. 787, 148 Cal.Rptr. 9, 582 P.2d 96.) Since the division of military pay as community property does not violate federal supremacy, it follows that no substantial federal interest is damaged by the division of 'disability' benefits which serve identical purposes.

"Mr. Milhan's attempt to avoid state law by citing the 'spendthrift' provision the Veterans' Administration applies to the benefits it administers would substitute a 'conflict in words' for the practical clash of interests which the Supreme Court has required for preemption. (Hisquierdo, supra, 439 U.S. at p. 581, 99 S.Ct. at p. 808.) Where a practical understanding of state and federal objectives demonstrates that both may be fully achieved, comity precludes the preemption of state law based only on semantic inconsistencies. (Citing cases.)"

We apply the same rule as did California with respect to the contention of James that his pension, now administered by the Veteran's Administration, under its "spendthrift clause" is secure from anticipation or consideration as a marital asset.

In objecting to the amount of the lump sum award to the wife, James also contends that the District Court showed its preference that he work rather than be unemployed and that it was improper for the District Court to consider James as having any income beyond the military pension which he is receiving.

The District Court, noting that James had been unemployed for some four years, nevertheless found that as a dentist or as a pilot, although the record showed no income earnings for these occupations, it would assume that his earnings from either of those occupations would be at least $16,000 per year, the amount that Joanne was making as an associate professor at Carroll College.

In effect, James objected to the District Court including his capacity for earnings as distinguished from his actual earnings in fixing the amount of the lump sum award.

It has been held that a trial court may consider the earning capacity of a husband in fixing the amount of alimony to be paid, even if the amount of alimony awarded is in excess of the actual earnings of the husband. See, Knutson v. Knutson (1961), 15 Wis.2d 115, 111 N.W.2d 905. Under our statutory scheme, the District Court is not bound by the actual earnings of the husband in apportioning the marital assets. The District Court can and must consider the capacity for greater earnings. Section 40-4-202, MCA, requires the District Court to consider the opportunity of the parties for future acquisition of capital assets and income. "Opportunity" is a broad word when used in this connection, and includes the capacity of the parties to earn future income.

The District Court in fixing the amount of the lump sum award for the wife used the criteria set out in section 40-4-202, MCA. In Cromwell v. Cromwell (1977), 174 Mont. 356, 570 P.2d 1129, we quoted from other cases of established standard of review:

> ". . . In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but, rather, did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or exceed the bounds of reason, in view of all the circumstances, ignoring recognized principles resulting in substantial injustice."

The District Court was especially thorough in its findings and in its discussion and conclusions relating to the lump sum judgment awarded in this case. In any event, with respect to the principal contention of James, that the District Court awarded a portion of his federal military retirement pension, or utilized it as the "lodestone" in making the lump sum award, it is nevertheless true that

-15-

nothing in the court's order affects directly the pension or James' right to receive the pension. The present marital assets, as found by the District Court, are more than sufficient to pay the lump sum judgment. They are assets that were acquired during the marriage. When the lump sum judgment is satisfied, James' pension payments will go to him untrammeled by any restriction or order of the District Court.

The reasons given by the District Court for the lump sum payment are cogent. Most of the property comprising the marital assets is located in either California or Canada. The District Court has no jurisdiction directly to affect those parcels of property. James had shown a penchant through the course of the litigation to ignore the orders of the District Court. As the District Court alliteratively concluded, "diversity, diversion, dispersion, difficulty of division, and inaccessibility of the marital property" make distribution by parcel not feasible.

We therefore find the amount of the lump sum award, and method of payment thereof, as provided in the judgment a proper exercise of the District Court's function in this case.

Issue No. 2. The District Court erred in awarding attorney fees of $15,081.69 to Joanne.

In its findings of fact (no. 25), the District Court found that Joanne's attorney had spent 306.5 hours at the rate of $42.21 per hour for a total of $12,936 and had proven costs of $2,145.69. The District Court went on to say that a very high percentage of work involved by Joanne's attorney, perhaps 80 percent, could have been avoided through cooperation by James.

James does not attack the hourly rate approved by the court. He does contend that the 306.5 hours is grossly

-16-

excessive. James contends that section 40-4-110, MCA, allows the court to award attorney fees "after consideration of the financial resources of both parties." The court may make such an award. James contends that only the financial resources of the parties may be considered by the court and that no reference to lack of cooperation may be had by the District Court in considering attorney fees. He also contends that Mrs. Karr, earning $16,000 as an associate professor, is capable of paying her own fees.

Joanne counters that the number of hours expended by her attorney was "necessary" and that the attorney fee was reasonable, considering the skill, complexity and effectiveness of the services rendered. The record shows substantial evidence introduced by both sides. Third party witnesses testified, and substantial documentary evidence was introduced by Joanne including elaborate time records and analyses of the services performed by her attorney in conjunction with the matter. The finding of the hours necessary is substantiated by evidence in the record and we are bound by the District Court's determination on that point. Rule 52(a), M.R.Civ.P.

Issue No. 3. The personal jurisdiction of the District Court over James Karr.

James contends that Montana does not have jurisdiction over his person in this matter because at the time that he was served with summons in the dissolution action, he had been enticed to return to Montana by Joanne.

The court records show that the petition for dissolution was filed in the District Court, May 19, 1977. James was served with a summons and complaint on May 31, 1977. His attorney filed a motion to dismiss on June 16, 1977, which was overruled on June 23, 1977. James' answer was not filed until March 26, 1979, after he had changed counsel and had retained his present counsel.

James contends that after Joanne filed for dissolution on May 19, 1977, and she had been granted on an ex parte application the custody of Kurtis Karr, she telephoned James stating that she could not control Kurtis and that she was going to go to Billings for the Memorial Day holiday. James came to Helena from Canada on May 28, 1977, and was served May 31, 1977, while he was in Helena. Joanne did not tell him during the telephone conversation that she had filed for a dissolution. James contends that the purpose of the telephone call was to get him to come to Helena, in order that he might be served with the summons, and that she knew he would come if he felt that Kurtis was left alone over the holiday.

Joanne counters that the husband's testimony was that he lived in Helena, Montana, from November 1976, and prepared an income tax return showing Helena as his residence.

The District Court specifically found against James on this contention, stating that he was a resident of the state at the time by his own declaration, and that he had come to this state again upon the accurate and truthful representation of Joanne that she was unable to control their son, and he was at the time taking care of his own and other family affairs.

The facts found by the District Court support personal jurisdiction over James. The fact of service of summons upon a defendant within the State of Montana, properly served, gives the District Court jurisdiction over the person of the defendant. Haggerty v. Sherburne Mercantile Co. (1947), 120 Mont. 386, 186 P.2d 884. Every court has judicial power to hear and determine the question of its own jurisdiction. In Re Boehme (D. Mont. 1941), 41 F.Supp. 426.

-18-

Here again, the facts giving rise to the personal juris-
diction of the District Court over James have been found by
the District Court, and its findings are supported by the
record in the case. Rule 52(a), M.R.Civ.P.

Issue No. 4. The court erred by including or excluding
certain assets of the marital estate.

There are several items included in the marital estate
to which James makes objection.

Royal Bank of Conquest. Here James contends that the
court erred by including the sum of $4,000 as marital
property which had been withdrawn from the Royal Bank of
Conquest on March 11, 1977, two months before the action for
dissolution was filed in Montana. James contends that this
money was paid into the Canadian dental retirement plan and
that the total figure of $10,505 which the court found as
marital assets for the Canadian dental retirement includes
this $4,000. Therefore, James contends that there is a
$4,000 duplication in the marital assets. Joanne contends
that there is no evidence in the record as to this item, and
the District Court apparently agrees, because it found
"there is no substantial evidence as to what was done with
any of this money but I would view the $4,000 withdrawal as
a part of [James'] 'race to the bank.'" There is no merit
to James' contention.

Canadian Bonds. The District Court included $9,000 in
Canadian bonds as a marital asset. Joanne and James held
six $1,000 Canadian bonds in their joint names and three
$1,000 Canadian bonds were held in the name of Joanne and
one each for the three children or a total of nine additional
bonds. The court found that the nine bonds owned jointly
with the children were purchased with no intent on the part

-19-

of the parties that a present gift to the children was being made. Inasmuch as Joanne was named as a joint payee with the children in each of the bonds, we see no merit in the contention that the nine bonds were not properly a part of the marital estate.

Canadian Dental Retirement Fund. The court valued this item in the marital estate at $10,505. James complains that there was no evidence as to what right James had to reduce this fund to present cash value, what penalty would be attached if it were withdrawn before he was eligible to use the deferred tax monies, nor was there any evidence as to the amount of taxes to be paid by James if he drew on the fund; further there was no evidence of who the beneficiaries of the fund would be after the death of James nor any provision made for discount on the difference between Canadian funds and American dollars.

The District Court found that there was "no evidence or law . . . submitted as to whether this fund was includable in the marital estate. In the absence of such a showing and in view of the fact that [Joanne] contributed to the fund itself, the fund will be included in the marital estate." The District Court has a right to rely on the record made before it. There is no merit in this contention.

Treasury Branch of Stettler. With respect to this matter, the District Court found:

> "In January 1976, [James] withdrew $15,231 from the account and sent it to [Joanne] in Helena. [Joanne] deposited the $15,231 in American Federal Savings and Loan. A year later, in January 1977, [James], then in and about Helena, withdrew $3,000 of this deposit and spent it on general family expenses. On the day [James] was served with the petition and summons in this case, May 31, 1977, he transferred the remaining $12,000 to the Royal Bank of Canada in Conquest, Saskachewan, whereupon his instructions and without the consent and knowledge of Joanne, it was placed in a certificate of deposit in the names of the Karr children. This move was patently made to avoid the inclusion of the $12,000 in the marital estate. It will be included."

-20-

On the basis of the facts cited, we must agree with the District Court.

Appraisal of California and Canadian Properties. The District Court valued the San Rafael, California, real property at $185,000 and the Stettler, Alberta, property at $26,000. Both findings were based upon appraisals presented in court. James disputes the validity of the appraisals on various grounds, but inasmuch as the court made a finding based on substantial credible evidence in the record, the findings must be accepted by us.

Other Contentions. James also disputes the failure of the District Court to include the value of personal property owned by the parties in Helena, Montana. The parties, however, had entered into a personal property division agreement and no evidence was adduced at trial with respect to this item. Attorney fees had been incurred by the parties in Canada over real property in Canada in the amount of $10,961.50, of which $6,053.75 remained due. James contends that this matter should have been included by the court in considering the net estate. The District Court concluded that attorney fees involved were not a marital debt for which the wife should be obligated. The conclusion of the District Court that no marital debt here was involved should not be disturbed.

The final contention of the husband is that in the award of the lump sum judgment, the court did not give James an opportunity to sell the real property outside of Montana in a manner that would allow him to split the proceeds with his wife, and that because of the lump sum judgment entered by the court, he may be faced with a deficiency judgment if the real property, when sold does not realize the amounts indicated.

-21-

A District Court, sitting in a marriage dissolution case, has the same broad powers as a court of equity in fashioning decrees that will be responsive to the fact situations before it, effective to accomplish the objectives that the District Court, through its judgment, determines must ensue and to do complete justice. See, Link v. State by & through Dept. of Fish & Game (1979), ___ Mont. ___, 591 P.2d 214, 36 St.Rep. 355. Here, the District Court found as a fact that James was not,

> "the ordinary reluctant litigant. He is an embittered and resolute opponent of 'the system', bent on defying and defeating it whenever and wherever possible and taking unscrupulous advantage of it when he can. It would therefore be futile, even specious for this court to order him to do anything. There can be no scheduled payments, for [Joanne] would have to obtain judgment for each one. There can be no division of property that would rely on his participation and cooperation because he would not give either. In view of this, the only realistic judgment this court can render is one for a lump sum judgment, knowing full that even that will be avoided and evaded to the extent possible."

Those are strong words, but they are not the enunciation of a district judge short of patience or troubled by a sour stomach. The record fully supports the District Court. It is time for James to be brought to book, and for him to realize that he is not above the law, and that a District Court has the power to compel even the most reluctant or recalcitrant to obey its mandates.

Joanne's Cross-Appeal. Should the District Court have included the present value of the federal military pension as a marital asset?

What we have said foregoing disposes of the cross-appeal. The District Court, in its discretion, did not include the present value of James' pension. Yet, the judgment of the Court, and the method of handling the distribution of the assets is eminently fair to Joanne. In this case, the District Court decided, in its discretion,

-22-

not to include this item as a marital asset.  We will leave the District Court's decision on this point undisturbed.

The judgment of the District Court is affirmed as to the appeal and the cross-appeal.  Costs to Joanne.

_____
                Justice

We Concur:

_____
Chief Justice

_____
_____
_____
                Justices

This cause was submitted prior to January 5, 1981.