FILED

12/16/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0077

DA 25-0077

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 289

IN RE THE MARRIAGE OF:

KAREN STEINBEISSER,

      Petitioner and Appellee,

  and

CRAIG STEINBEISSER,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Richland, Cause No. DR-19-16
Honorable Kaydee Snipes Ruiz, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Marybeth M. Sampsel, Measure Law, PC, Kalispell, Montana

      For Appellee:

          Terrance L. Toavs, Law Office of Terrance L. Toavs, PLLC,
Wolf Point, Montana

Submitted on Briefs:  November 5, 2025

Decided:  December 16, 2025

Filed:

                    _____
                                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Craig Steinbeisser (Craig or Appellant) appeals from the December 16, 2024 Order on Pending Motions entered by the Seventh Judicial District Court, Richland County, holding him in contempt and modifying a previously entered dissolution of marriage decree involving Craig and former spouse Karen Steinbeisser (Karen or Appellee).[1] We consider:

1. *Whether the District Court erred by holding Craig in contempt of court.*

2. *Whether the District Court erred by modifying the judgment's distribution of marital property.*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The Appellant and Appellee were married on May 19, 1991, in Richland County, Montana. During the marriage, the parties had two children. While neither party brought significant property into the marriage, the couple accumulated both property and debt during their approximately 31-year marriage, pursuant to their farming and other work. Karen was the bookkeeper for family businesses.

¶3 In February 2019, Karen petitioned for dissolution of the marriage, citing mutual agreement of the parties to end the marriage due to serious marital discord and the impossibility of reconciliation. A lengthy proceeding followed to judicially determine the value of the marital estate. Karen sought discovery of financial information related to Craig's family ranch partnership, 5-S Partnership (Partnership), in which Craig owned a

---

[1] Karen's maiden name of Iversen was restored following the District Court's November 9, 2023, Findings of Fact, Conclusions of Law and Decree of Dissolution of Marriage.

25% interest. After the Partnership objected to the request, Karen moved the District Court to compel Craig to disclose the information, which the District Court ordered.

¶4 The parties each submitted to the court proposed valuations of the marital estate, which varied widely, particularly with regard to the Partnership. Craig's valuation utilized original purchase prices of property rather than current value, based upon "financial statements prepared in-house." Karen utilized a valuation by a certified public accountant who specialized in preparing property valuations for litigation, "adjust[ing] from historical value to fair market value, and average[ing] appraisal reports." The court found Karen's valuations "to be more credible and accurate than Craig's valuations," and that evidence "squarely and credibly contradicts Craig's valuation."

¶5 Regarding the Partnership, the District Court ultimately found the Partnership's assets totaled approximately $25,288,300, and the net equity value was $14,284,645, with Craig's individual share valued at $3,214,000. Finding that the parties "do not agree on how this asset should be distributed," and that "the parties are asset rich and cash poor, with most of their assets tied up in 5-S Partnership," the District Court determined that "Craig should be given the opportunity to make an equalization payment over time." Up to that point, two motions regarding Craig making equalization payments had been made in the proceeding and resolved in Karen's favor. The decree, entered November 9, 2023, thus included in a paragraph entitled "Equalization Payment," on page 13:

> [T]he Husband shall pay to Wife monthly equalization payments of $3,500.00 per month, starting December 1, 2023, over the next seventeen (17) years, with the last payment due December 1, 2040, or a total of $714,000.00.

3

If Craig fails to pay Karen within this time period or refuses to make this equalization payment, pursuant to this schedule, then Craig's interest in 5-S Partnership shall be awarded to Karen. . . .

In the event Craig divests or otherwise liquidates his 25% interest in [] 5-S Partnership and/or VS Inc. in the next seventeen (17) years, any remaining balance of the equalization payment shall be then paid in full within 90 days.

¶6 On December 6, 2023, Craig filed a motion for *Nunc Pro Tunc* Amendment of Exhibit A to the decree, which was the District Court's allocation of properties between the parties. He argued that, while the District Court stated in its findings that Craig should retain all property he could trace to the inheritance from his father, Exhibit A had allocated the LPL Financial account ending in 4092 (Account 4092), which he asserted was traceable to his inheritance, to Karen. He contended that "[f]rom the testimony presented and according to Trial Exhibit J, this account was inherited from Craig's father and, therefore, was not to be included as part of the marital estate." Karen opposed the motion on the ground that Account 4092 had been commingled with other funds and could not be clearly traced to Craig's inheritance.

¶7 While that motion was pending, on December 13, 2023, Craig filed a notice of appeal of the judgment to this Court, and Karen filed a notice of cross-appeal the same day. Noting that Craig had failed to make the initial equalization payment on December 1, Karen applied to the District Court on December 15, 2023, for an order requiring Craig to "show cause why he should not be held in contempt of court for failing to pay the court ordered, monthly equalization payment[s.]" In response to a motion by Craig, on December 27, 2023, the District Court stayed the judgment pending Craig's appeal to this Court.

4

¶8     This Court, noting that the District Court had entered the stay order "prematurely and without the benefit of Karen's response in opposition[,]" granted Karen's motion for relief from the stay and remanded the case to allow Karen the opportunity to respond to Craig's motion for a stay, and to supplement the record for appeal, on January 23, 2024. However, before the District Court could hold a hearing on remand, Craig moved this Court to dismiss his appeal, which we granted on February 26, 2024.  Karen thereafter also dismissed her cross-appeal.

¶9     The parties resumed pursuit of their post-judgment motions before the District Court, and the District Court authorized Karen to conduct post-trial discovery regarding what had occurred to estate accounts that had been awarded to her, as some had been emptied by Craig, including Account 4092.  Craig asserted that he had transferred the balance of that account, without judicial authority, because he believed it contained inherited funds.  The discovery was followed by Karen's motion to compel Craig to disclose his updated financial information, which was granted by the District Court.  In June 2024, Karen moved for an order requiring execution of a clerk's deed to transfer the marital home to Karen, which had been awarded to her in the decree, but asserting Craig had refused to cooperate by signing a deed, and for payment of her attorney fees associated with that motion.  Craig responded that "it is unclear what the urgency is in placing the title into her name, as there is no debt on the property and no required refinancing," and opposed Karen's request for fees.  Karen also moved to hold Craig in contempt.

¶10    Up to this point in the proceedings, Craig had made no equalization payments, maintaining instead that he was choosing to transfer his interest in the Partnership to Karen.

5

However, delivery of the interest to Karen was delayed. According to Craig's opening brief to this Court, this delay resulted for various reasons, including Karen's name being listed incorrectly on documents, a lack of knowledge about how to transfer his interest, and the Partnership's attorney's prolonged vacation. And, what would become a key point in the current dispute, the Partnership had undergone a reorganization by the partners during this time after entry of the decree. However, whatever the reasons, the result was that Karen received neither the equalization payments nor the Partnership interest during this time.

¶11 On September 25, 2024, the Partnership's attorney contacted Karen with a proposal for transfer of Craig's interest in the Partnership. However, the Partnership had been reorganized since the decree, about which an expert for Karen testified at a hearing on November 6, 2024. The expert explained that, while a vote of partners holding an 80% capital share was previously necessary to determine capital contributions, that percentage had been reduced in the restructuring to 75%. Consequently, if Karen held Craig's 25% partnership interest, her interest would no longer be sufficient to successfully oppose the imposition of new capital obligations upon the partners, as it had been previously. Further, the agreement was amended to require only a 75% vote, reduced from 80%, to authorize distributions to the partners, thus potentially eliminating the need for her agreement on distribution decisions. Karen's expert testified that, under the restructuring, the value of the 25% share "would be significantly less, just based on the fact that Karen [would] have no voice and no power to make any decisions in th[e] company," including the possible reduction or elimination of distributions from the Partnership. The District Court found

6

that Craig's Partnership interest had been "materially altered" by the amendment to the agreement.

¶12    Further, the Partnership had entered into a verbal management agreement with another entity also owned by the 5-S partners, VS Inc., to take over management of the Partnership operations. As a result of this verbal agreement, the District Court found that the Partnership stopped paying draws to its partners altogether. Whereas Craig had been drawing $4,613.62 per month from the Partnership, this amount was reduced to zero "and his VS, Inc., income increased by approximately the same amount." Karen refused to accept the transfer of interest proposed by Craig and the District Court found that she "should not be required to accept it" in satisfaction of the judgment, because she would have "virtually zero control while Craig could retain the income through the verbal 'management contract.'"

¶13    In its December 16, 2024 Order, the District Court found that the alteration of Craig's Partnership interest "did not excuse his duty to make equalization payments," and further, that the decree did not "provide Craig's duty to make payments [was] suspended while he works on transferring an interest to Karen." The District Court found that Craig had transferred funds out of accounts that had been awarded to Karen into other accounts controlled by himself. Craig argued that these transfers were fair because the District Court had made an error in the original distribution, but the court rejected this argument, reasoning that the distribution plan was "not an 'equal' division," but rather "an 'equitable' division," and that any supposed error did not "affect the equity of the court's distribution."

¶14 The District Court found Craig in contempt for failing to make equalization payments, and for his other obstructive actions, and awarded Karen her attorney fees. "In light of the new evidence," the District Court struck the provision of the original decree that permitted Craig to remedy his failure to make equalization payments by transferring his partnership interest, as the reorganization of the Partnership was "inconsistent with the decree because it would defeat the court's intent" that Karen "receive an equitable share of the estate." The District Court required Craig to:

- Restore to Karen the balance of Account 4092, $153,336.83, and accompanying post-judgment interest by June 1, 2025.

- Restore to Karen the balance of the LPL Financial accounts ending in 5607 and 6371, with current balance due at $1,314.56 and associated interest payments.

- Pay Karen $45,671 to make up for missed equalization payments.

- Restore to Karen the balance of the Yellowstone Bank account ending in 3434, $15,496.80, and accompanying interest.

¶15 Craig appeals.

## STANDARD OF REVIEW

¶16 A district court's order of contempt is ordinarily not subject to appeal, except by a limited statutory exception for contempt judgments in a family law case "when the judgment or order appealed from includes an ancillary order that affects the substantial rights of the parties involved." Section 3-1-523, MCA. Upon a determination that the "family law" exception applies, as here, "we review the order to determine whether the district court acted within its jurisdiction and whether the evidence supports the contempt."

8

*Marez v. Marshall*, 2014 MT 333, ¶ 23, 377 Mont. 304, 340 P.3d 520 (citing *Novak v. Novak*, 2014 MT 62, ¶ 37, 374 Mont. 182, 320 P.3d 459).

¶17 We review findings of fact in dissolution proceedings "to determine whether they are clearly erroneous." *Hollamon v. Hollamon*, 2018 MT 37, ¶ 7, 390 Mont. 320, 413 P.3d 460 (citation omitted). We will affirm a district court's distribution of property and maintenance, absent a showing of plain error or abuse of discretion. *In re Marriage of Crilly*, 2005 MT 311, ¶ 10, 329 Mont. 479, 124 P.3d 1151 (citing *In re Marriage of Payer*, 2005 MT 89, ¶ 9, 326 Mont. 459, 110 P.3d 460). Finally, we review a district court's conclusions of law for correctness. *In re Marriage of Rudolf*, 2007 MT 178, ¶ 16, 338 Mont. 226, 164 P.3d 907 (citation omitted).

## DISCUSSION

¶18 *1. Whether the District Court erred by holding Craig in contempt of court.*

¶19 "[D]isobedience of any lawful judgment, order, or process of the court" constitutes contempt. Section 3-1-501(1)(e), MCA.[2] "Contempt of court is a discretionary tool used to enforce compliance with a court's decisions." *Woolf v. Evans*, 264 Mont. 480, 483, 872 P.2d 777, 779 (1994). Contempt can be either civil or criminal. Section 3-1-501(4), MCA. "A contempt is civil if the sanction imposed seeks to force the contemnor's compliance with a court order." Section 3-1-501(4), MCA.

¶20 Craig argues the District Court erred by holding him in contempt for simply "acting in accordance with the underlying order[.]" He argues the District Court "isolated one

---

[2] Section 3-1-501, MCA, was amended in 2025 following the District Court's order appealed from here. However, none of the amendments impact provisions discussed herein.

provision, deprived that paragraph of any meaning, omitted what had been inserted, and inserted what had been omitted," referring to the equalization payment provision, quoted above. Craig contends that the decree did not "command" him to make the payments, rather, it "created a true choice," namely, to either make the equalization payments to Karen or tender his interest in the Partnership to her, and thus, "[w]ithout a command, there can be no disobedience[, a]nd without disobedience, there can be no contempt."

¶21 During the contempt hearing, the District Court characterized this interpretation of the decree offered by Craig as "bad faith." It explained that the equalization payments were a mandatory obligation, with the Partnership interest transfer serving as a backup remedy to "ensure the payments were going to be made, but apparently that's just not enough to make that happen." The court referenced Craig's other violations of the decree, such as his failure to sign the deed to the marital home, his failure to make any payments despite long delays, his unauthorized transfer of funds awarded to Karen, and his discovery obstructions. Even if Craig's interpretation of the decree is assumed, arguendo, to be correct, he first made no equalization payments, and then he affirmatively undermined the efficacy of a transfer of the Partnership interest. Craig's claim that he transferred the funds within Account 4092 to another account because he believed it contained inherited funds, even if true, does not present a valid reason for directly disobeying the decree. In short, he did nothing in these regards but violate the decree, and the District Court's contempt finding is supported by substantial credible evidence. This is a very appropriate case for use of "a discretionary tool used to enforce compliance with a court's decisions." *Woolf*, 264 Mont. at 483, 872 P.2d at 779.

10

¶22 Craig argues the District Court erred by modifying the judgment "as a sanction for civil contempt," because modification of a decree is not a remedy for contempt and it violates § 3-1-520, MCA. Karen answers that "the District Court did not amend the Judgement as a sanction for contempt," but rather modified the decree to preserve the original intention of the decree, which Craig had undermined. The District Court's conclusion that "the language at page 13, lines 6-9 of the judgment regarding transfer of the 5-S Partnership should be stricken[,]" demonstrates that the court sought to close any potential loophole Craig might continue to exploit in an attempt to further evade his obligations to Karen under the decree, rather than impose a sanction on Craig, and thus does not violate statute. Indeed, the District Court's Order expressly states that "the court reserves judgment on penalties for contempt."

¶23 *2. Whether the District Court erred by modifying the judgment's distribution of marital property.*

¶24 Craig argues that the District Court "simply held Craig in contempt and then used contempt as a vehicle to modify the property division, without addressing the statutory requirements that would authorize such modification." He contends that neither party consented in writing to modification of the decree and the District Court erred by modifying the property division of the estate without making the findings to do so as required by §§ 40-4-202, and -208, MCA. He argues the District Court contradicted the decree by ordering him to restore the full balance of Account 4092 because the funds were traceable to his inheritance. Karen answers that the District Court's modification was justified under its equitable powers and that "the appellant acquiesced or participated" in

11

the amendment. Notably, on this point, Craig's counsel stated during the hearing that, "I understand the Court sits in equity, and that in equity you have the option to fashion relief that you seem to feel most appropriate, and with that there could be modifications to the decree."

¶25 "Section 40-4-202, MCA, vests the district court with broad discretion to equitably apportion the marital estate in a manner equitable to each party according to the circumstances of each case." *In re Marriage of Frank*, 2022 MT 179, ¶ 35, 410 Mont. 73, 517 P.3d 188 (citation omitted). Further, the property disposition provisions of a dissolution decree may be modified "if the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state." Section 40-4-208(3)(b), MCA.

¶26 In *Karr v. Karr*, 192 Mont. 388, 628 P.2d 267 (1981), we highlighted the district court's findings that a spouse in that case was no "ordinary reluctant litigant. He is an embittered and resolute opponent of 'the system,' bent on defying and defeating it whenever and wherever possible and taking unscrupulous advantage of it when he can." *Karr*, 192 Mont. at 410, 628 P.2d at 279. As a consequence, we explained that

> A District Court, sitting in a marriage dissolution case, has the same broad powers as a court of equity in fashioning decrees that will be responsive to the fact situations before it, effective to accomplish the objectives that the District Court, through its judgment, determines must ensue and to do complete justice.

*Karr*, 192 Mont. at 410-11, 628 P.2d at 279. The District Court was likewise empowered here to exercise its equitable powers to do complete justice. The record reflects that it inquired of counsel about its power to modify the decree, and there was no objection raised

12

by either party. There was certainly an evidentiary basis in the record for the court to do so, and it entered sufficient findings, both written and as stated orally in the hearing, to demonstrate evidentiary support for the modification.

¶27 Lastly, Craig's argument regarding Account 4092 does not establish error. The District Court ruled that it had "awarded this account to Karen after applying the factors set forth in M.C.A. § 40-4-202 because the court found allocating LPL Financial account 4092 to Karen is equitable, considering all of the circumstances," a decision in accordance with *Funk*'s holding regarding inherited property. *See In re Funk*, 2012 MT 14, ¶¶ 19, 32, 363 Mont. 352, 270 P.3d 39. The court cited multiple exhibits in making this distribution to Karen, determining that the inheritance received by Craig from his father's estate had been commingled in Account 4092. The District Court stated, "[A]ccount 4092 may have contained life insurance proceeds from Craig's family but Craig co[m]mingled these proceeds with marital funds." After an analysis of the record, it is our conclusion that the District Court's ruling was supported by substantial evidence, and it did not abuse its discretion.

¶28 We conclude the District Court did not err by holding Craig in contempt, and by modifying the dissolution decree.

¶29 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

13